TotteN, J.,
delivered the opinion of the Court.
*39 In 1818, Samuel Dinsmore died intestate, leaving bis wife Elizabeth and nine children surviving him. The said Elizabeth administered on his estate. The estate consisted of two-hundred acres of land, the homestead: a slave, Fanny, and small personal effects. The Admin-istratrix caused the slave and personal effects to be sold in 1818, and herself became the purchaser of the slave and of a portion of the personal effects. In 1833, an agreement was made for the settlement of the estate, by the Administratrix and her children. It was to the effect that the Administratrix convey to her children the slave, Fanny, and her increase, now four in number, and the personal effects of intestate, yet in her possession, reserving to herself a life-estate therein, and an equal share with the children: — the conveyance to be in satisfaction of eight hundred and one dollars and thirty-six cents, the' amount due from her to the children, as distributees of said estate. And it was further agreed that at the termination of the life-estate, said property should be equally divided amongst the said owners thereof — the children of intestate agreeing to account for, and bring into said division, any gifts or advancements of real or personal estate, received by any of them from their father in his lifetime,' so as to make an equal division of the entire estate.
In conformity to this agreement, the said Elizabeth Dinsmore, on the 5th February, 1833, conveyed said slaves and other personalty to James Dinsmore and the others, her said children, reserving to herself a life-estate, &c., which conveyance was accepted by the said children. James Dinsmore had received by gift from his father, one hundred acres of land, worth four hun_ dred dollars, and some personal effects. The other chil *40 dren, or some of them, had received some personal effects, but no land. James Dinsmore now refused to give in his land as an advancement; but on the 21st October, 1844, the children of the intestate executed a written agreement for the division of said estate in conformity to the agreement of 1833 — the said James Dinsmore being one' of the parties to said agreement. At this time, 1844, the said Elizabeth Dinsmore proposes and consents to relinquish her life-estate in said property to her children; and said agreement provides that each of said children shall bring into the account for division, any property received by him or her from said intestate in his life, or from his estate since Ms death; and in case of disagreement as to its value, the same to be determined by persons to whom the matter shall be referred. The agreement recites that it was intended to settle the ydiole matter equitably and amicably, and to avoid the expense of litigation. They could not agree upon the value of the one hundred acres of land given by the intestate to James Dinsmore. Thereupon, James Dinsmore selected Henry A. Farns-worth, and the other party selected William -, to report upon the value of said land. They did not agree. We are satisfied that Farnsworth advised James Dinsmore not to go on with the agreement — not to give in the land, and that it would bring him in debt to the -estate. James Dinsmore declined to execute his agreement, and on the next day, 22nd October, 1844, conveyed his interest in remainder, in said slaves, to said Farnsworth. Farnsworth stated that he had purchased a law suit, and that if James Dinsmore were not bound to account for said land, he should recover a share in the slaves. The land was valued, by disin *41 terested witnesses at four Hundred dollars, and the estate ascertained and divided under said agreement; James Dinsmore not participating in the division. It is proved that the land was of the value of four hundred dollars; and if James Dinsmore was liable under said agreement to account for its value, he had received more than an equal share of said intestate’s estate, real and personal, and was not entitled to any further interest therein at the date of his conveyance to said Farnsworth.
The counsel for defendant contends that James Dins-more was bound, independent of the agreement, to collate and account for the land in the distribution of the personal estate; and he relies upon Acts 1166, ch. 3; 1784, ch. 22; Pearce vs. Gleaves, 10 Yer. R. 359. On the contrary, this construction is denied by plaintiff’s counsel, and he insists that the rule referred to had no existence until it was declared by Act 1839, ch. 48.
"Waiving the discussion of this question in the present ease, and assuming.that land settled upon a child by the intestate in his life-time, was not, prior to 1839, subject to be collated in the division of the personal estate, we come to the position relied upon by plaintiff’s counsel; and that is, that James Dinsmore was not bound by his said agreement, for want of any valid consideration on which it could be founded.
We do not concur in this view of the case. ITere was a contested question as to the title of the slaves. It is true, that we consider it void at the election of the children; but the mother assumed to be owner and claimed and held possession of the slaves under color of title. The distributive portions due the children had not been paid, nor the amount due to each ascertained. The nature *42 and value of gifts and advancements to each., was a matter for adjustment; it was insisted that James Dinsmore, tbe only child to whom land had been given, was bound to collate it in the division of the balance of the estate, real and personal; and this he was not inclined to do. The facts were not disputed; the contest related to the legal rights of the parties updn an admitted and known state of facts.
It is not pretended that the agreement was in any wise influenced by force, fraud or imposition.
Now, if James Dinsmore had full knowledge of the true state of his rights; if he knew that he was not bound to collate the land, and yet agreed, under the circumstances before stated, to collate it, we are not aware of any principle upon which he can avoid the force and effect of his. agreement.
If he made it in mistake of law, believing that the land was subject to be collated, even that is no objection to the validity of the agreement. For, it must now be taken as a settled principle, that an ignorance of the law, and a consequent mistake as to the title founded upon such ignorance, is no ground to rescind agreements, or to set aside the solemn acts of the parties. Trigg vs. Read, 5 Hum. 535.
But this agreement may well be supported upon the ground that it is the settlement of a family dispute, and contains in itself an amicable adjustment of their conflicting claims and interests. Such agreements are viewed, in a court of equity, with special favor, and are firmly upheld and maintained, in the absence of a well-grounded objection. ¥e see no such objection in the present ease. 1 Story Eq. Jur., §§ 113, 130, and notes.
*43 We might say further, that the agreement was founded in mutual promises, imposing a like duty upon each of the parties; that is, that each should collate and account for all that he had received: and that a mutual promise is a good consideration to uphold an agreement even in the strictness of the common law.
But we rest the case mainly upon the principles before stated; and are perfectly satisfied that the parties should be held as fully bound by their said agreement.
This agreement was made before the assignment of James Dinsmore to the plaintiff, who received it with a full knowledge of all the facts and circumstances in the case. The result of the account shows that James Dinsmore had no further interest in the estate at the date of that assignment, and consequently the plaintiff acquired no interest under it.
The decree of the Chancellor will be affirmed.